[No. 41677-8-II.   Division Two.   January 23, 2013.]

*In the Matter of the* WASHINGTON BUILDERS BENEFIT TRUST.

RE SOURCES FOR SUSTAINABLE COMMUNITIES ET AL., *Appellants,*
v. BUILDING INDUSTRY ASSOCIATION OF WASHINGTON ET AL.,
*Respondents.*

38

40

*Eric D. "Knoll" Lowney* (of *Smith & Lowney PLLC*); *Michael E. Withey* (of *Law Offices of Michael Withey*); and *Howard M. Goodfriend, Ian C. Cairns,* and *Catherine W. Smith* (of *Smith Goodfriend PS*) (*Tonna K. Farrar* and *Andrew S. Friedman* of *Friedman & Balint PC*, of counsel), for appellants.

*Harry J.F. Korrell III, Robert J. Maguire*, and *David C. Tarshes* (of *Davis Wright Tremaine LLP*); *Matthew D. Clark* (of *Faegre Baker Daniels LLP*); *Gwendolyn C. Payton* and *Ryan P. McBride* (of *Lane Powell PC*), for respondents.

¶1 VAN DEREN, J. — Re Sources for Sustainable Communities, A-1 Builders, SF McKinnon Company Inc., Cabinetworks, and Living Space (collectively Participants) appeal the trial court's September 13, 2010, partial summary judgment order and letter opinion dismissing some of their claims against the Building Industry Association of Washington (BIAW), BIAW-Member Services Corporation, the Washington Builders Benefit Trust, and individual Washington Builders Benefit trustees (collectively Trustees).[1] This appeal concerns a dispute over the Trustees' handling of revenue generated though the operation of its retrospective rating program for employers' industrial insurance premiums under chapter 51.18 RCW, which allows the Washington State Department of Labor and Industries (Department) to rebate a portion of employers' industrial insurance premiums.

¶2 The Participants argue on appeal that the trial court erred in granting summary judgment to the Trustees in ruling that (1) the Trustees' flat marketing assistance fee did not breach the terms of the trust, (2) the Trustees were not required to spend revenue generated from the marketing assistance fees on marketing, and (3) the timing of the

---

[1] Because we hold that BIAW, BIAW-Member Services Corporation, and the Washington Builders Benefit Trust's named trustees all had fiduciary duties with regard to Participants' industrial insurance premium refunds, we collectively refer to those parties as "Trustees."

Trustees' marketing assistance fee payments to BIAW and local associations did not violate trust duties.

¶3 The Participants also appeal the trial court's September 10, 2010, order dismissing their claims against Master Builders Association of King and Snohomish Counties, based on the Master Builders Association's CR 12(c) motion for judgment on the pleadings. Specifically, the Participants argue that the trial court erred in dismissing their claims against the Master Builders Association because there were genuine issues of material fact regarding whether the Master Builders Association owed fiduciary duties to the Participants. Additionally, the Participants appeal the trial court's March 3, 2011, final judgment and order, arguing that the trial court erred by refusing to require the Trustees to disgorge funds those defendants improperly retained through breach of their fiduciary duties to the Participants.

¶4 Finally, the Participants appeal the trial court's March 4, 2011, order denying their motions for attorney fees at trial. The Participants also request attorney fees on appeal.

¶5 The Trustees cross appeal the trial court's September 13, 2010, partial summary judgment order and letter opinion, arguing that the trial court erred in granting summary judgment to the Participants and finding that (1) the employer participants' enrollment agreements imposed trust duties on the Trustees and (2) the Trustees' retention of interest breached fiduciary duties it owed to the Participants.

¶6 The Trustees also appeal the trial court's March 3, 2011, final judgment and order and the trial court's March 4, 2011, order denying their motion for attorney fees, arguing that the trial court erred by failing to give effect to exculpatory and attorney fees provisions in the employer participants' enrollment agreements. The Trustees also request attorney fees on appeal.

¶7 The Master Builders Association also cross appeals the trial court's order denying its motion for attorney fees, and it requests attorney fees on appeal.

¶8 We affirm in part and reverse in part. We affirm the trial court's determination that the Trustees violated their fiduciary duties under the enrollment agreement by retaining interest earned on deposited funds, commingling funds, and failing to provide statutorily required accountings. We affirm other rulings as well, but we reverse the trial court for failing to require the Trustees to disgorge approximately $400,000 in interest they wrongfully retained. We also reverse the trial court's ruling that the Trustees were entitled to summary judgment on the Participants' claim that genuine issues of material fact exist regarding whether the Trustees violated their fiduciary duties under the trust agreement in expending funds earmarked for marketing and promotion of the plan, and we remand to the trial court for further proceedings on that issue. We also award attorney fees and costs to the Participants for issues on which they prevailed at trial, as well as fees and costs for those issues on which the Participants prevailed on appeal. We deny the Master Builders Association's request for attorney fees.[2]

## FACTS

### DEPARTMENT OF LABOR AND INDUSTRIES RETROSPECTIVE RATING PROGRAM

¶9 Chapter 51.18 RCW allows the Department to rebate a portion of employers' industrial insurance premiums if employers are enrolled in a retrospective rating program, which is "a voluntary financial incentive program offered by the [Department] to encourage improvements in work-

---

[2] Several of the facts cited in this opinion come from the unchallenged December 17, 2010, trial court findings of fact, which are verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

place safety." WAC 296-17B-010. In general, retrospective rating program participants earn rebates "by preventing workplace illnesses and injuries, and helping injured workers return to work." WAC 296-17B-010. "However, participation involves risk: [p]articipants not successful in controlling losses can be assessed additional premiums." WAC 296-17B-010.

¶10 Employers may participate in the Department's retrospective rating program individually or through a sponsored group. WAC 296-17B-010. Under former WAC 296-17-90445 (2003), the Department paid "[a]ll retro group refunds . . . directly to the sponsoring organization" and "[i]t [wa]s the responsibility of the sponsoring organization to distribute any refund to the group members."

¶11 At the close of a plan year, the Department reviews a retro group's three-year claims history to retrospectively adjust the group's premium for that plan year. If the Department determines that a retro group is eligible for a return on their premium, the Department tenders a primary adjustment payment to the group sponsor, which typically occurs in May following the plan year. The Department may subsequently increase the total adjustment amount and tender additional payments to a group sponsor. On the other hand, the Department may also decrease the total adjustment amount to resolve a dispute or to account for changes in the estimated total refund. Until the Department issues its final adjustment in the third year following the plan year, it may reduce or retract a previously granted retro refund or issue a penalty.

PARTIES TO THIS CASE

I. THE TRUSTEES

¶12 BIAW is a not-for-profit trade association that sponsors a retrospective rating program. BIAW calls its retrospective rating program the return on industrial insurance (ROII). In 1990, the BIAW and the Master Builders Asso-

ciation[3] established the Washington Builders Benefit Trust (WBB Trust). BIAW created the WBB Trust to hold and invest ROII refunds from the time that BIAW receives rebates from the Department until it distributes the rebates to ROII employer participants. The BIAW president appoints seven BIAW members to serve as named trustees of the WBB Trust. The named trustees are volunteers who are not directly compensated for their services.

¶13 In 1993, the named trustees and BIAW formed the BIAW-Member Services Corporation, a wholly owned for-profit subsidiary of BIAW. BIAW and the BIAW-Member Services Corporation share offices and staff; for example, the executive vice president and the accountant act in the same capacity for both BIAW and the BIAW-Member Services Corporation. BIAW and the BIAW-Member Services Corporation also have a consolidated budget that allocates staff members' salaries between BIAW and the BIAW-Member Services Corporation. Additionally, each BIAW-Member Services Corporation executive committee member serves on BIAW's executive committee and each BIAW board member serves on the BIAW-Member Services Corporation's board of directors, although some BIAW board members and executive committee members were not aware that they also served on the BIAW-Member Services Corporation's board of directors and executive committee.

¶14 Originally, the named trustees and BIAW staff served as the BIAW-Member Services Corporation's board of directors. The WBB Trust does not employ any staff; it too relies on BIAW's or BIAW-Member Services Corporation's staff. The BIAW-Member Services Corporation performs services for the WBB Trust that include "administrative support for meetings, calculation of refunds, processing refunds, responding to inquiries, and administration of appeals for reconsideration of the application of the trust's

---

[3] The Master Builders Association was known as Seattle Master Builders Association when it established the Washington Builders Benefit Trust with BIAW in December 1989.

46

underwriting criteria for certain employer participants."
Clerk's Papers (CP) at 7151. Although the BIAW-Member
Services Corporation performs these known services for the
WBB Trust, the named trustees have not specifically iden-
tified or documented any of the duties it has delegated to
the BIAW-Member Services Corporation. It also has failed
to specify or document any oversight or other safeguards in
its relationship with the BIAW-Member Services Corpora-
tion, such as requiring segregated accounts or billings for
the BIAW-Member Services Corporation's services to the
WBB Trust. Moreover, the BIAW-Member Services Corpo-
ration has never submitted bills to the WBB Trust for its
services.

¶15 In 1993, the named trustees drafted a new declara-
tion of trust[4] to govern the WBB Trust, beginning in 1994.
The 1994 "Declaration of Trust" provides in part:

ARTICLE IV – TRUSTEES: POWERS, DUTIES AND
RESPONSIBILITIES

Section 1. The Trustees shall hold in trust for the benefit of
the Employer Participants any Funds transferred to the Trust
from predecessors [sic] trusts existing for the same purposes as
this Trust, and all Adjustments transferred to BIAW by the
[Department] together with all accruals thereto and income
therefrom. The Trustees shall create and administer a Fund for
each Plan to receive, reserve, invest, pay out and account for
the Adjustments received pursuant to each Plan, to be held in
trust for the benefit of the Employer Participants.

. . . .

Section 9. The Trustees may employ Agents or other person-
nel who will administer the Funds; pay or provide for the
payment from the Funds of all reasonable and necessary
expenses in administering the affairs of the Trust, including,
without limitation, all expenses which may be incurred in
connection with the establishment of the Trust; employ admin-
istrative, legal, accounting, other expert and clerical assistance;
purchase or lease materials, supplies and equipment which the

---

[4] The WBB Trust's original 1990 declaration of trust is not a subject of this
appeal.

Trust, in its discretion, deems necessary or appropriate in the performance of the Trustees' duties, or the duties of the Agents or employees of the Trust.

Section 10. The Trustees shall pay or provide for the payment from the Funds of all reasonable and necessary expenses of BIAW or any other entity in administering the retrospective rating program on behalf of Employer Participants.

Section 11. Before distribution of the balance of each Fund left after payment of all expenses and final Adjustments by [the Department], the Trustees shall to [sic] pay to BIAW a marketing assistance fee of 10% of all Employer Participants' distributive shares of the Fund. In addition, the Trustees shall pay to any local association with members who are Employer Participants in a Plan a marketing assistance fee of 10% of the distributive share of the Fund allocated to Employer Participants who are members of such local association.

. . . .

Section 17. . . . The Trustees shall not be liable for any mistake or error of judgment in the administration of the Trust, except for willful misconduct, so long as they continue to exercise their duties and powers in a fiduciary capacity primarily in the interests of BIAW, the local associations, and the Employer Participants.

CP at 210-12. The 1994 Declaration of Trust was signed by named trustees but was not distributed to, or signed by, ROII employer participants.[5]

II. THE PARTICIPANTS

¶16 The Participants are five former BIAW employer members that enrolled in BIAW's ROII program. To participate in BIAW's ROII program, the Participants had to demonstrate their program eligibility, and they were required to sign the ROII enrollment agreement. The ROII enrollment agreement provides in part:

---

[5] Although the Trustees challenge the trial court's finding of fact 17, they do not challenge the portion of the trial court's finding stating that the 1994 Declaration of Trust was not distributed to, or signed by, employer participants.

2. **The Plan.** Under the terms of the [Department] Agreement, BIAW will be entitled to receive any Premium Returns from [the Department] with respect to the Coverage Period on behalf of the Member and other Participants. Alternatively, [the Department] may demand Penalties from the Member and other Participants with respect to the Coverage Period.

3. **Plan Administration.** BIAW will administer the Plan on behalf of the Member and other Participants. . . . BIAW may delegate these administrative duties to a subsidiary controlled by BIAW. The [WBB Trust] will receive, on behalf of Participants, all Premium Returns paid by [the Department] pursuant to this Agreement . . . .

4. **Obligations and Agreements of the Member.**

(a) The Member agrees to pay to BIAW or its subsidiary a Member Enrollment Fee equal to one and one-half percent (1.5%) of the Member's Premium for the [participation period], or One Hundred Fifty and no/100 Dollars ($150.00), whichever amount is greater.[6]

(b) By execution of this Agreement, the Member absolutely assigns to the Trust all Premium Returns that may be payable by [the Department] on behalf of the Member, to protect the Member and BIAW from Penalties and from other future obligations to [the Department] with respect to industrial insurance for the Coverage Period and any other period. The Member further authorizes the Trustees to pay from the Premium Returns the balance of the Enrollment Fee and such costs and expenses for the operation and administration of the Plan as the Trustees may direct. The Member further authorizes the Trustees to transfer ten percent (10%) of the Participant's Premium Returns applicable to the Coverage Period to local associations and 10% to BIAW for marketing and promotion of the Plan.

. . . .

6. **Distribution of Premium Return.** . . . The Member shall have no legal right or entitlement to any portion of said

---

[6] After the Participants filed suit, BIAW changed the ROII participation form to provide, " 'In consideration for their efforts in marketing and promoting the Plan, the Member further authorizes the Trustees to pay ten percent (10%) of the Participants' Premium Returns applicable to the Coverage Period to local associations and 10% to BIAW.' " Br. of Resp'ts/Cross-Appellants BIAW at 11 n.6.

sums or any interest or benefit accruing from the investment of any such sums, until such time as the Trust, in its sole discretion, declares a distribution of any portion of the Premium Return to Participants. The Member may not assign or pledge any portion of such sums and they may not be attached voluntarily or by operation of the law by any creditor of the Member.

. . . .

9. **Attorneys' Fees.** In the event BIAW or the Trust is required to hire legal counsel to enforce the Member's obligations under this Agreement, the Member agrees to pay all legal fees and cost incurred by the Trust or BIAW in any action or proceeding.

10. **Limitations of Liability and Indemnification.** The Member hereby releases and agrees to indemnify and hold BIAW, its subsidiary, the Trust, and all of the members of the Trust harmless from any and all liability for any decision which may now or hereafter by [sic] made by BIAW, its subsidiary, or the Trust with regard to the Plan, any Premium Returns (including interest, principal and profit), the payment of any such sums or the investment of any such sums.[7]

CP at 83-84. The ROII enrollment agreements were prepared by BIAW staff and could not be modified by the applying employer-participant if the employer wanted to participate in the plan. Around the time of this litigation, approximately 6,000 mostly small employers participated in BIAW's ROII program.

ROII PROGRAM ADMINISTRATION

¶17 When the Department issued a refund to BIAW in April or early May each year, BIAW deposited the funds into

---

[7] This language is taken from the BIAW's 2007-2008 ROII enrollment agreement form. Although the language in BIAW's ROII enrollment agreements may have varied slightly from year to year, we need not examine those variations based on the trial court's unchallenged finding of fact 20. Finding of fact 20 states, "Although enrollment agreements may not have been identical since 1994, Exhibit 2227 was often utilized by the parties as the standard language in the enrollment agreements signed by the employer participants." CP at 7145.

the BIAW-Member Services Corporation money market accounts at South Sound Bank, money market accounts that also contained BIAW-Member Services Corporation funds. Under South Sound Bank's policies, funds deposited in the BIAW-Member Services Corporation's money market accounts had to remain in the accounts for at least two business days before the BIAW-Member Services Corporation could transfer the funds. After this waiting period expired, the BIAW-Member Services Corporation could transfer the funds to the WBB Trust's investment accounts at Wells Fargo Bank. But when transferring the funds to the WBB Trust's investment accounts, the BIAW-Member Services Corporation retained any interest earned on the funds while in the money market accounts (inbound interest).

¶18 During the years relevant to this appeal, 2004 to 2008, the BIAW-Member Services Corporation held nearly $200 million in Department refunds in its money market accounts, which refunds generated approximately $63,000 in inbound interest that the BIAW-Member Services Corporation retained. After the BIAW-Member Services Corporation transferred the Department's refunds to the WBB Trust, the named trustees invested the funds before distributing the proceeds to the ROII employer participants. Although funds held in the BIAW-Member Services Corporation's money market accounts were insured only up to $100,000 until 2009 and up to $250,000 after 2009, the BIAW-Member Services Corporation held as much as $50 million in those accounts at that time.

¶19 In June of each year, the BIAW-Member Services Corporation transferred a 10 percent marketing assistance fee from the WBB Trust investment accounts to the BIAW-Member Services Corporation's money market accounts, which fee was later distributed to the local associations. In July of each year, the BIAW-Member Services Corporation transferred an additional 10 percent marketing assistance fee to its money market accounts, which fee was distrib-

uted to BIAW. These transfers did not include any interest or investment earnings on the 10 percent fees while they were held in the WBB Trust investment accounts. Also in July of each year, the BIAW-Member Services Corporation transferred the funds to be distributed to ROII employer participants to a money market account linked to a checking account. The BIAW-Member Services Corporation then distributed the employer participants' checks to the local associations, which in turn distributed the checks to the individual employer participants.

¶20 The BIAW-Member Services Corporation retained all interest earned on these funds from the time the funds were transferred from the WBB Trust to the BIAW-Member Services Corporation's money market account until the employer participants deposited their ROII refund checks (outbound interest). This retained interest totaled approximately $361,000 during 2004 to 2008, the years relevant to this appeal.

¶21 Because the Department may retract a refund or issue a penalty between the times it tenders its primary return in year one and when it issues its final adjustment in year three, the Trustees distributed returns to ROII employer participants in three phases. In the first phase, which typically occurred in July after the Department issued its primary adjustment in April or May, the Trustees distributed 70 percent of the Department's rebate to employer participants. Then in July of the following year, the Trustees distributed to employer participants an additional 20 percent of the total of the Department's primary and secondary adjustments. Finally, in July of the third year after the Department issued its final adjustment, the Trustees distributed the remaining rebate amount, if any, to the employer participants.

PROCEDURAL FACTS

¶22 The Participants filed a petition and complaint against the Trustees and local associations, including the

Master Builders Association, alleging that the Trustees and local associations breached their fiduciary duties and requesting a trust accounting under the trustees' accounting act.[8] In response, the Trustees admitted that the Participants were beneficiaries of the WBB Trust under the terms of the 1994 Declaration of Trust but denied that BIAW or the BIAW-Member Services Corporation owed fiduciary duties to the Participants, asserting that the ROII enrollment agreements merely created a contractual relationship between the parties.

¶23 The trial court ordered the Trustees to conduct a trust accounting consistent with the requirements of former RCW 11.106.030 (1985) and RCW 11.106.040.[9] In accordance with the trial court's order, the Trustees submit-

---

[8] Ch. 11.106 RCW.

[9] Although the trial court's order refers to RCW 11.106.130 and RCW 11.106.140, this appears to be a typographical error, as those provisions do not exist and former RCW 11.106.030 and RCW 11.106.040 provide guidelines for trust accounting. Former RCW 11.106.030 provides:

In addition to the statement required by RCW 11.106.020 any such trustee or trustees whenever it or they so desire, may file . . . an intermediate account under oath showing:

(1) The period covered by the account;
(2) The total principal with which the trustee is chargeable according to the last preceding account or the inventory if there is no preceding account;
(3) An itemized statement of all principal funds received and disbursed during such period;
(4) An itemized statement of all income received and disbursed during such period, unless waived;
(5) The balance of such principal and income remaining at the close of such period and how invested;
(6) The names and addresses of all living beneficiaries, including contingent beneficiaries, of the trust, and a statement as to any such beneficiary known to be under legal disability;
(7) A description of any possible unborn or unascertained beneficiary and his interest in the trust fund.

After the time for termination of the trust has arrived, the trustee or trustees may also file a final account in similar manner.

RCW 11.106.040 provides:

At any time after the later of one year from the inception of the trust or one year after the day on which a report was last filed, any settlor or beneficiary of a trust may file a petition . . . asking the court to direct the trustee or trustees

ted their trust accounting on May 1, 2009. On June 25, 2010, the trial court entered a summary judgment order dismissing the Participants' claims against all of the local associations apart from the Master Builders Association,[10] concluding that the local associations did not owe fiduciary duties to the Participants because the local associations were not trustees. The trial court later granted the Master Builders Association's CR 12(c) motion for judgment on the pleadings, dismissing the Participants' claims against it.

¶24 On September 13, 2010, the trial court entered an order addressing the parties' six cross motions for summary judgment, to which the trial court attached a letter opinion explaining the reasons for its various rulings. The trial court concluded that (1) both the ROII enrollment agreements and the 1994 Declaration of Trust were valid trust instruments that imposed fiduciary trust duties on the Trustees; (2) the inbound interest earned on Department refunds belonged to ROII employer participants and, thus, the Trustees violated their trust duties by retaining the inbound interest; (3) exculpatory clauses contained in the 1994 Declaration of Trust and the ROII employment agreements did not abrogate the Trustees' fiduciary duties; and (4) the Trustees breached their fiduciary duties by commingling trust assets with their own assets, but the trial court reserved issues related to damages for trial. The trial court further concluded that (5) the governing trust instruments authorized the Trustees to pay BIAW a 10 percent marketing assistance fee and the local associations an additional 10 percent marketing assistance fee, (6) the Trustees and the local associations were not required to spend revenue generated from the marketing assistance fee on marketing, and (7) the timing of the Trustees' collection of the marketing assistance fee did not violate the trust. The trial court

to file in the court an account. At the hearing on such petition the court may order the trustee to file an account for good cause shown.

[10] The Master Builders Association did not join the other local associations in their summary judgment motion because the Master Builders Association was then in settlement negotiations with the Participants.

denied summary judgment on the issue of outbound interest, finding that genuine issues of fact existed that precluded summary judgment.[11]

¶25 The parties proceeded to trial on the Participants' remaining claims against the Trustees, and the trial court entered findings of fact and conclusions of law on December 17, 2010. The trial court's conclusions of law state:

1. Under Washington law, trustee exculpatory and indemnification provisions are valid and enforceable, but they are not effective to waive the obligation that a trustee act with good faith and honest judgment. Both the enrollment agreements and the Declaration of Trust that the Court has formerly determined controlled the obligation of the trust and the trustees have broad clauses releasing the defendants from liability for the kinds of claims asserted in this case.

2. However, the waiver of liability clauses do not shield the defendants from the remaining claims in this litigation, which are claims of failure to exercise good faith or are claims of violations of statutory duties such as the duty to perform an accounting. Those duties are not waiveable.

3. The defendants violated their duties under the trust when they retained interest from the period of time between when the Department . . . transferred funds to BIAW and before the funds were transferred to the [WBB Trust] investment accounts. The defendants violated their duties under the trust when they retained interest earned from the period of time between when BIAW-[Member Services Corporation] distributed the checks to member employees and when the member employers deposited those checks. That includes all of the time that has been considered outbound interest.

4. The defendants violated their duties under the trust when BIAW-[Member Services Corporation] commingled funds in its account or accounts.

5. The defendants violated their duties under the trust when they failed to provide annual accountings.

---

[11] The trial court's September 13 order and letter opinion resolved a number of other issues raised in the six cross motions for summary judgment that this opinion does not address because those issues are not relevant to this appeal.

6. The petitioners have not otherwise proven a breach of trust on their remaining claims and they are dismissed with prejudice.

7. Based upon those findings and conclusions, the court orders the following remedies:

8. Petitioners have properly invoked the Court's equity jurisdiction under RCW 11.96A and RCW 11.106, and the Court, therefore, has broad discretion to fashion appropriate equitable relief. The petitioners have disclaimed any right to money damages in this case and seek only equitable relief.

9. To the extent that petitioners seek payment of interest retained by BIAW-[Member Services Corporation], that requested relief is denied. The Court finds that the damages to each of the petitioners is not in significant amounts and that the trustees primarily exercised sound discretion and maintained the trust on behalf of the beneficiaries.

10. The Court is also aware the petitioners represent only five out of thousands of employer participants and that at least eight other employer participants have implored the Court to deny any relief.

11. Accordingly, the BIAW, BIAW-[Member Services Corporation,] and the [WBB Trust] trustees are ordered to modify their practices to be consistent with their obligations under the law according to the Court's rulings and consistent with the documents created by them in establishing the rights and duties under the trust, specifically, the Declaration of Trust and the enrollment agreements.

CP at 7154-56.

¶26 On March 4, 2011, the trial court entered its final judgment, which incorporated its December 17 findings and conclusions and its September 13 order on cross motions for summary judgment. Also on March 4, 2011, the trial court entered its findings of fact, conclusions of law, and order denying all of the parties' motions for attorney fees and costs.

ISSUES ON APPEAL

¶27 The Participants timely appeal portions of the trial court's September 10 order granting the Master Builders Association's CR 12(c) motion for judgment on the pleadings, its September 13 partial summary judgment order and letter opinion, and its March 4 final judgment order and order denying attorney fees.[12] The Trustees timely cross appeal portions of the trial court's September 13 partial summary judgment order and letter opinion, as well as the March 4 final judgment and order denying attorney fees. The Master Builders Association also timely cross appeals the trial court's March 4 order denying attorney fees.

ANALYSIS

I. TRUSTEES' CROSS APPEAL

¶28 Because the Trustees raise contentions in their cross appeal that, if true, are dispositive of several of the issues the Participants raise in their appeal, we address the Trustees' cross appeal before turning to the Participants' appeal.

¶29 The Trustees first contend that the trial court erred on summary judgment by finding that the ROII enrollment agreements imposed trust duties on the Trustees. The Trustees admit that they intended to form an express trust, but they argue that the 1994 Declaration of Trust is the only controlling trust instrument and, thus, trust duties attached only to the named trustees' handling of funds

---

[12] The Participants also assign error to the trial court's June 25, 2010, order dismissing Participants' claims against all of the local association defendants apart from the Master Builders Association, but the Participants do not provide any argument supporting their assignment of error. Accordingly, we do not address it. RAP 10.3(a)(6); *see also Watson v. Maier*, 64 Wn. App. 889, 899, 827 P.2d 311 (1992) ("Assignments of error lacking argument or citation to authority will not be considered by the courts of appeals.").

while in the WBB Trust accounts and not to BIAW or BIAW-Member Services Corporation while the funds were in BIAW-Member Services Corporation's money market accounts. We disagree and affirm that portion of the trial court's summary judgment order and letter opinion finding that the ROII enrollment agreements created an express trust that imposed trust duties on the Trustees.

A. Standard of Review

¶30 We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. *In re Estate of Black*, 153 Wn.2d 152, 160, 102 P.3d 796 (2004); *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party has the burden of proving that there is no genuine issue of material fact. *Black*, 153 Wn.2d at 160-61. If the moving party meets its burden, the burden shifts to the nonmoving party to " 'set forth specific facts showing that there is a genuine issue for trial.' " *Black*, 153 Wn.2d at 161 (quoting *LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975)).

¶31 The nonmoving party must set forth evidentiary facts and cannot meet its burden by relying on "speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). In determining whether a genuine issue exists, we construe the facts and reasonable inferences from the facts in the light most favorable to the nonmoving party. *Black*, 153 Wn.2d at 160-61. Factual issues may be decided as a matter of law only if reasonable minds could reach but one conclusion. *Sherman v. State*, 128 Wn.2d 164, 184, 905 P.2d 355 (1995).

¶32 Generally, there are two basic categories of trusts: express trusts and resulting trusts. *Farrell v.*

*Mentzer*, 102 Wash. 629, 632, 174 P. 482 (1918). Express trusts are "[t]hose trusts which are created by contract of the parties and intentionally." *Farrell*, 102 Wash. at 632. Here, the Participants do not assert that the Trustees were subject to a resulting trust and, thus, we need determine only whether the ROII enrollment agreements demonstrated the parties' intent to create an express trust. To determine whether the ROII enrollment agreements created an express trust imposing fiduciary duties on the Trustees, we must look to the language of the contract. *Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n*, 133 Wn. App. 835, 846, 138 P.3d 638 (2006).

> "An express trust is one created by the act of the parties; and, where a person has, or accepts, possession of money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes, an express trust exists."

*Westview*, 133 Wn. App. at 845-46 (internal quotation marks omitted) (quoting *State v. Southard*, 49 Wn. App. 59, 63 n.3, 741 P.2d 78 (1987)).

B. Trust Duties under the ROII Enrollment Agreements

¶33 Here the ROII enrollment agreements stated in part:

> BIAW will be entitled to receive any Premium Returns from [the Department] with respect to the Coverage Period *on behalf of the Member and other Participants.* . . .
>
> . . . BIAW will administer the Plan *on behalf of the Member and other Participants* . . . . The [WBB Trust] will receive, *on behalf of Participants*, all Premium Returns paid by [the Department] pursuant to this Agreement . . . .
>
> . . . .
>
> . . . **Distribution of Premium Return.** . . . The Member shall have no legal right or entitlement to any portion of said sums or any interest or benefit accruing from the investment of

any such sums, *until such time as the Trust, in its sole discretion, declares a distribution of any portion of the Premium Return to Participants.*

CP at 83-84 (emphasis added).

■ ¶34 The ROII enrollment agreements' language clearly and unequivocally demonstrated the parties' intent that BIAW, or a BIAW-controlled subsidiary, would accept the employer participants' premium returns, not as BIAW's " 'absolute property,' " but rather " 'to hold and apply it for certain specified purposes,' " including distributing returns, if any, to employer participants. *Westview*, 133 Wn. App. at 846 (internal quotation marks omitted) (quoting *Southard*, 49 Wn. App. at 63 n.3). This language indicates an express, intentional trust was created.

¶35 The Trustees argue that the trial court erred in finding that the ROII enrollment agreements imposed trust duties notwithstanding the language of the agreements themselves because (1) employer participants did not have any property interest in the Department's potential retro refunds to BIAW to hold in trust for the employer participants, (2) the enrollment agreements could not bind the named WBB Trust trustees because they were not parties to the agreement, and (3) the Participants have conceded that they did not intend to create a trust. We disagree.

### 1. Property Interests in Department Refunds

¶36 First, in support of their argument that employer participants did not have a property interest in potential department refunds to Trustees to hold in trust, the Trustees cite to WAC 296-17B-200, a department regulation that was not in effect until November 19, 2010, after the trial below had concluded. WAC 296-17B-200 provides:

In group retrospective rating, participating employers become members of an enrolled group sponsored by an approved organization. Employers continue to pay premiums directly to the [D]epartment as determined by chapter 296-17 WAC. [The

Department] calculate[s] the group's retrospective rating premiums as though the standard premiums paid by members of the group were paid by the sponsor, and claims assigned to employer members were assigned to the group sponsor. Group sponsors are responsible for the retrospective rating premiums for the coverage period enrolled. *If an adjustment results in [the Department] refunding premiums, the refund is the property of the group sponsor.* If an adjustment results in [the Department] assessing additional premiums, the additional premiums are the responsibility of the group sponsor. With limited exceptions explained in these rules, the [D]epartment is not involved in the private contractual relationship between group sponsor and group member.

(Emphasis added.)

¶37 The Trustees appear to argue that we may apply the Department's amended regulation retroactively because the amendment merely clarified the existing regulation's position that group sponsors, alone, have property rights to potential Department refunds. The Trustees thus contend that because only BIAW—as the retro group sponsor—had any property right in potential Department refunds, the trial court erred in finding on summary judgment that the employer participants were settlors of the trust.[13]

¶38 We may apply an agency's amendment to an administrative regulation retroactively if "(1) the agency intended the amendment to apply retroactively, (2) the

---

[13] Even if we were to accept the Trustees' argument that the trial court should not have found BIAW to be the settlor of the trust, the Trustees fail to articulate how the trial court erred in finding the ROII enrollment agreements were trust instruments that imposed fiduciary duties upon BIAW. Regardless of whether BIAW or the employer participants were settlors of the trust, the ROII enrollment agreements clearly show the parties' intent that BIAW, or a BIAW subsidiary, would hold the Department refunds in trust for the benefit of the employer participants. Although the parties have not cited to any Washington case squarely addressing the issue, where the parties clearly manifest in a written contract their intent to create an express trust, it is immaterial which party was the settlor of the trust. *See, e.g.,* RESTATEMENT (THIRD) OF TRUSTS § 3 cmt. a (2003) (identifying contexts in which "significant questions may arise concerning the person who is properly to be treated as the settlor of a trust," none of which are present here). We do not discern how the Trustees' argument leads to the conclusion that the enrollment agreements are not valid trust instruments.

effect of the amendment is remedial or curative, or (3) the amendment serves to clarify the purpose of the existing rule." *Averill v. Farmers Ins. Co. of Wash.*, 155 Wn. App. 106, 115, 229 P.3d 830 (2010). Because the Trustees do not assert that the Department intended to apply WAC 296-17B-200 retroactively or that the amendment's effect is remedial, we need address only whether WAC 296-17B-200 merely clarifies the existing rule. We hold that it does not.

■■ ¶39  To the extent that WAC 296-17B-200 purports to vest a property right in the Department's refunds solely with a group sponsor, the amendment changed the Department's previous regulations, which directed that Department refunds were paid to the group sponsor but also required that the group sponsor distribute the refunds to the sponsor's employer participants. *See* former WAC 296-17-90445. Because WAC 296-17B-200 changed the agency's prior regulations, it does not apply retroactively. *Champagne v. Thurston County*, 163 Wn.2d 69, 79, 178 P.3d 936 (2008).

2. Acceptance of Trust Duties by the WBB Trust's Named Trustees

¶40  The Trustees also argue that the ROII employer participant enrollment forms could not create an express trust because the named WBB Trust trustees did not accept trust responsibilities under the enrollment agreements. To support their argument, Trustees cite a Washington case, *Laughlin v. March*, 19 Wn.2d 874, 879, 145 P.2d 549 (1944) (quoting *Dingwell v. Seymour*, 91 Cal. App. 483, 508, 267 P. 327 (1928)), that briefly discusses, in dicta, a California case addressing the essential elements of a valid trust under California law, including " 'acceptance of the trust by the trustee.' " Even if we accept the Trustees' argument that acceptance by the trustee is a necessary element to creating

a trust,[14] BIAW clearly accepted trust duties under the enrollment agreements. Accordingly, the BIAW defendants' argument regarding the named trustees not ratifying the enrollment agreement goes to the issue of which entities had trust duties under the enrollment agreement contract, not whether the enrollment agreement contract was a valid trust instrument.

### 3. Participants' Intent To Create a Trust Embodied in the Enrollment Agreements

■ ¶41 Finally, the Trustees assert that the trial court erred by finding the employer participants' enrollment agreements created an express trust because the Participants admitted that they did not intend to create a trust. To support this assertion, the Trustees cite to portions of the various Participants' depositions where the Participants denied that they intended to establish a trust. That the individual Participants, in their responses to deposition questions, denied their intent to create a trust has no bearing on the trial court's finding that the enrollment agreements created an express trust because the Participants' intent to create the trust was embodied in the enrollment agreements.[15] Thus, on summary judgment the trial court properly found that the enrollment agreements were valid trust instruments. Accordingly, the ROII enrollment agreements created an express trust.

---

[14] *But see* RESTATEMENT (THIRD) OF TRUSTS § 14 ("A trust can be created without notice to or acceptance by any beneficiary or trustee.").

[15] *Restatement (Third) of Trusts* § 13 comments a and b provide in part:

It is immaterial whether or not the settlor knows that the intended relationship is called a trust, and whether or not the settlor knows the precise characteristics of a trust relationship.

The manifestation of intention requires an external expression of intention as distinguished from undisclosed intention. . . .

. . . Except as otherwise provided by statute, . . . the required manifestation of intention to create a trust may be by written or spoken words or by conduct.

## C. Breach of Trust Duties by Trustees

¶42 Next, the Trustees argue that the trial court erred by finding on summary judgment that Trustees breached trust duties by retaining approximately $63,000 in "inbound interest," which was the interest earned on Department refunds between the time the funds were deposited into BIAW-Member Services Corporation's money market accounts and the time the funds were transferred to the WBB Trust. We disagree.

¶43 The Trustees also appeal the trial court's final judgment and order finding that Trustees breached their trust duties by retaining approximately $361,000 in "outbound interest," the interest earned on Department refunds between the time the refunds were transferred from the WBB Trust to the BIAW-Member Services Corporation's money market account and the time ROII employer participants deposited their checks. Again we disagree.

¶44 A trustee, as a fiduciary, owes beneficiaries the "highest degree of good faith, care, loyalty and integrity." *Esmieu v. Schrag*, 88 Wn.2d 490, 498, 563 P.2d 203 (1977). "It is the duty of a trustee to administer the trust in the interest of the beneficiaries." *Tucker v. Brown*, 20 Wn.2d 740, 768, 150 P.2d 604 (1944). "A trustee's duties and powers are determined by the terms of the trust, by common law and by statute." *In re Estate of Ehlers*, 80 Wn. App. 751, 757, 911 P.2d 1017 (1996). At common law, Washington courts "have defined a trustee's duty of care, skill and diligence to be that degree of care, skill and diligence that would be exercised by an ordinary prudent man engaged in similar affairs." *In re Trust of Parks*, 39 Wn.2d 763, 767, 238 P.2d 1205 (1951); *Monroe v. Winn*, 16 Wn.2d 497, 508, 133 P.2d 952 (1943).

### 1. Inbound Interest

¶45 The Trustees cite RCW 11.104A.070(b)(1) to support their contention that the trial court erred by

finding on summary judgment that their retention of inbound interest constituted a breach of trust duties. That statutory provision provides in part, "An asset becomes subject to a trust . . . [o]n the date it is transferred to the trust." RCW 11.104A.070(b)(1). The Trustees' contention thus rests on their assertion that the ROII enrollment agreements did not create an express trust and, therefore, Trustees did not owe the Participants trust duties until the Department refunds were transferred into the WBB Trust accounts. Having rejected this assertion above, the Trustees' argument that trust duties did not attach to the management of funds held in BIAW-Member Services Corporation's money market accounts lacks merit. And, as our Supreme Court held in *Lynn v. City of Longview*, 15 Wn.2d 528, 533, 131 P.2d 164 (1942), "All increase in the value of a trust fund derived from investment or reinvestment returns or from interest earned on the fund, belongs to, and becomes a part of, the corpus of the trust estate in the absence of some specification to the contrary in the instrument or the statute creating the trust."

¶46 Accordingly, the trial court properly found that the Trustees' retention of interest, which interest belonged to the trust corpus, constituted a breach of trust duties.[16]

### 2. Outbound Interest

¶47 The Trustees also contend that the trial court erred by concluding in its final judgment and order following trial that Trustees breached their trust duties by retaining outbound interest because (1) the interest retained was reasonable compensation for BIAW-Member Services Corporation's services, (2) such retention of interest is a usual

---

[16] The BIAW defendants also assert that their retention of approximately $63,000 in inbound interest and approximately $361,000 in outbound interest did not constitute a breach of trust because the amounts were de minimis as applied to the five Participants and when compared to the total refunds distributed to the Participants. We reject this contention for reasons addressed in the section of this opinion addressing the Participants' argument on the remedy for the BIAW defendants' retention of interest.

and customary practice, and (3) the Participants failed to mitigate the interest Trustees retained by failing to immediately deposit their refund checks. We disagree.

¶48 On an appeal from a bench trial, our review is limited to determining whether substantial evidence supports the trial court's findings of fact and, if so, whether the findings support the trial court's conclusions of law. *City of Tacoma v. State*, 117 Wn.2d 348, 361, 816 P.2d 7 (1991). "Substantial evidence" is "a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). Unchallenged findings of fact are verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002). We defer to the finder of fact on issues regarding witness credibility and the weight of conflicting evidence. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994). We review de novo a trial court's conclusions of law. *Sunnyside*, 149 Wn.2d at 880.

¶49 Without citation to legal authority and in the absence of any language in the trust instrument permitting such practice, the Trustees claim that they may retain outbound interest as reasonable compensation for BIAW-Member Services Corporation's services to the trust. This post hoc rationalization, that BIAW-Member Services Corporation may pay itself for services using trust funds without the beneficiaries' knowledge or consent, does not comport with the general trust principle that interest earned on trust funds belong to the trust corpus absent "some specification to the contrary in the [trust] instrument." *Lynn*, 15 Wn.2d at 533. Because the trust instrument did not provide that BIAW-Member Services Corporation could retain interest earned on trust funds to compensate itself for trust services, the trial court correctly concluded that such practice constituted a breach of the trust.

¶50 Additionally, the Trustees assert that Participants cannot maintain a claim for interest earned on trust funds

due to Participants' failure to timely deposit their refund checks. This assertion, however, fails to acknowledge that the Participants' suit sought to restore to the trust corpus the funds that Participants claimed the Trustees improperly retained and did not request that the Trustees pay damages to the Participants directly. More importantly, the Trustees fail to relate their assertion to any claim of error, as the trial court did not order the Trustees to return the outbound interest they had improperly retained. To the extent that the Trustees forward this assertion in response to the Participants' issue on appeal regarding the trial court's remedy for the Trustees' breach of trust, we consider that assertion in our analysis of the issue below.

### 3. Long Practice of Retaining Interest Not Applicable to Express Trust Agreement

¶51 The Trustees also assert that their retention of outbound interest was not a breach of trust because it is a "usual and customary practice." Br. of Resp'ts/Cross-Appellants BIAW at 35 (boldface omitted). Again, the Trustees fail to support this proposition with citation to Washington law.[17] Instead, the Trustees cite a document from Wells Fargo Bank that discloses its practice of retaining interest earned on trust accounts under certain circumstances. The Trustees also cite the declaration of a Wells Fargo financial advisor stating that retaining interest on funds while those funds are awaiting deposit is a usual and customary practice.

¶52 The Wells Fargo Bank document does not assist the Trustees because, unlike the Trustees, Wells Fargo discloses

---

[17] The BIAW defendants cite one California case, *Van de Kamp v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 204 Cal. App. 3d 819, 853, 251 Cal. Rptr. 530 (1988), to support the proposition that it is not a violation of trust duties to retain outbound float. But the BIAW defendants read the *Van de Kamp* holding too broadly and that case is inapplicable in this context. In *Van de Kamp*, the California Court of Appeal held that in light of California statutes allowing a bank to self-deposit— conduct that is otherwise *"contrary to the general law of trusts"*—the bank-trustee "may profit from the use of such funds by means of self-deposit." 204 Cal. App. 3d at 836, 853 (emphasis added). We do not consider it as persuasive authority.

to beneficiary customers and in contracts its ability to retain interest under certain circumstances. More importantly, in forwarding this argument, Trustees appear to request that we reweigh the evidence in their favor, as it does not assert that substantial evidence did not support the trial court's findings or that the findings did not support the trial court's conclusion that the Trustees breached their trust duties by retaining outbound interest. But in an appeal from a bench trial, we defer to the trial court on issues regarding the weight of the evidence. *Burnside*, 123 Wn.2d at 108.

¶53 We also reject the Trustees' assertions at trial and on appeal that their conduct did not constitute a breach of trust duties because it has been their long-standing practice to commingle trust funds with their own funds and to retain interest earned on the trust funds while held in BIAW-Member Services Corporation's money market accounts. Washington courts have repeatedly rejected the assertion that a litigant may defend its improper conduct by showing a long-standing practice of engaging in such conduct.

¶54 For example, in *Thurston County v. Western Washington Growth Management Board*, 164 Wn.2d 329, 339, 190 P.3d 38 (2008), a case in which BIAW intervened on behalf of Thurston County, the county sought review of a Western Washington Growth Management Hearing Board's decision invalidating the county's comprehensive plan. Among the county's claims was that the growth management board acted outside its statutory authority by implementing a bright-line test to evaluate the county's comprehensive plan. *Thurston County*, 164 Wn.2d at 352-53. Although our Supreme Court recognized that the growth management board had used this bright-line test for 13 years, it nonetheless held that the board acted outside its statutory authority by enforcing the test. *Thurston County*, 164 Wn.2d at 353. Thus, our Supreme Court established, albeit in the administrative law context, that a litigant

cannot defend its challenged conduct by claiming that it has engaged in such conduct over a long period of time.

¶55 Our Supreme Court similarly invalidated the Washington Utilities and Transportation Commission's long-standing practice of granting monopolies to local telephone companies in *In re Registration of Electric Lightwave, Inc.*, 123 Wn.2d 530, 539-40, 869 P.2d 1045 (1994). In so holding, our Supreme Court acknowledged that the utilities commission had engaged in its challenged practice over a long period of time, but it admonished, "[A]ppellants confuse the [local telephone companies'] historic enjoyment of a de facto, partial monopoly with a statutorily-authorized, de jure monopoly." *Elec. Lightwave*, 123 Wn.2d at 539-40. Following our Supreme Court's decisions in *Thurston County* and *Electric Lightwave*, we likewise reject the Trustees' argument here that their administration of the trust monies was proper because it had been administering the trust in the same manner over a long period of time.

¶56 We also reject the Trustees' assertion that they did not commit a breach of trust because they acted under the mistaken belief that their conduct was proper under the law. Although the Trustees' mistaken belief regarding its trust duties may be relevant to determining whether the exculpatory provisions shielded the Trustees from liability, it has no bearing on whether the Trustees violated their trust duties by improperly commingling trust funds and retaining interest earned on the trust funds. As our Supreme Court recognized in *Thurston County*, a mistaken belief that a long-standing practice is lawful does not ensure its legality.

¶57 This court has similarly rejected the assertion that a party does not violate the law where it mistakenly believes its conduct was proper. For example, in *Edelman v. State ex rel. Public Disclosure Commission*, 116 Wn. App. 876, 886, 68 P.3d 296 (2003), *aff'd*, 152 Wn.2d 584, 99 P.3d 386 (2004), we held that "in promulgating WAC 390-16-311, the [Public Disclosure Commission], however well-intentioned, ex-

ceeded its statutory authority" by promulgating a rule that conflicted with plain language of the governing statute. *See also Tobin v. Dep't of Labor & Indus.*, 169 Wn.2d 396, 400-404, 239 P.3d 544 (2010) (The Department erred in seeking reimbursement from a claimant's third party recovery for pain and suffering notwithstanding its argument that it believed its conduct was proper.); *Wash. Fed'n of State Emps. v. Dep't of Gen. Admin.*, 152 Wn. App. 368, 379, 383, 216 P.3d 1061 (2009) (holding that the Department acted outside the scope of its authority by promulgating certain regulations addressing bid procedures, despite its argument that it believed that it acted properly); *Dep't of Labor & Indus. v. Mitchell Bros. Truck Line*, 113 Wn. App. 700, 702, 707, 54 P.3d 711 (2002) (The Department misread former RCW 51.08.180 (1991) where it defined certain truck drivers as "workers" rather than "owners," though the Department argued it acted under the belief that its definition was correct.).

### D. The Trustees' Liability

¶58 Next, the Trustees assign error to the trial court's conclusions of law 3, 4, 5, and 11 to the extent that those conclusions imposed liability on each of the trustee entities (BIAW, BIAW-Member Services Corporation, and the named WBB Trust trustees) for breach of trust duties that the Trustees contend were committed by only one of the trustee entities. We hold that the trial court did not err in concluding that all of the trustee entities were liable for breach of trust duties.

¶59 Conclusions of law 3, 4, and 5 essentially provide that all of the Trustees violated trust duties by (1) retaining inbound interest, (2) retaining outbound interest, (3) commingling trust funds with nontrust funds, and (4) failing to provide beneficiaries with annual accountings. And conclusion of law 11 orders all of the parties comprising the Trustees to modify their practices to be consistent with the trial court's rulings.

¶60 Several unchallenged findings of fact showing that the Trustees operated as a single entity in regard to administering the trust support the trial court's conclusions of law. For example, the trial court's unchallenged findings state:

3. BIAW Member Services Corporation . . . is BIAW's wholly-owned for-profit subsidiary. [WBB] Trust . . . is the trust related to BIAW's retro program . . . . The trust is managed by seven trustees appointed by BIAW's president who selects the trustees from among BIAW's membership.

. . . .

13. BIAW established [the] WBB[ Trust] to hold and invest ROII refunds between the time [the Department] pays any refunds to BIAW and the distribution of refunds to employer participants. BIAW is the sponsor of the ROII program . . . .

14. In 1993, the WBB[ Trust] trustees chose to change their role in the ROII program and divest themselves of day-to-day operations. In 1993, the WBB [Trust] trustees and BIAW formed BIAW-[Member Services Corporation]. The [T]rustees and BIAW staff served as the original BIAW-[Member Services Corporation] board of directors. . . .

. . . .

18. . . . BIAW chose to use a trust and to allocate responsibilities among BIAW, BIAW-[Member Services Corporation], and [WBB Trust].

. . . .

27. Pursuant to the enrollment agreement, BIAW is responsible for administration of the ROII program but may delegate this responsibility to its subsidiary.

28. WBB[ Trust] has no staff and, instead, relies upon certain joint staff of the BIAW and BIAW-[Member Services Corporation].

29. BIAW-[Member Services Corporation] staff handles the trust funds . . . .

30. When BIAW-[Member Services Corporation] was handling trust money by apparent authority of the trustees, fiduciary duties attached to the handling of those trust funds.

BIAW-[Member Services Corporation] and BIAW share offices and staff, including their executive vice-president and accountant. The salaries and benefits of many staff members are apportioned between BIAW and BIAW-[Member Services Corporation]. It is unclear to what degree BIAW and BIAW-[Member Services Corporation] staff time and resources are devoted specifically to tasks on behalf of WBB[ Trust].

31. Each member of the executive committee of BIAW-[Member Services Corporation] also sits on the executive committee of BIAW. Each board member of BIAW is also a board member of BIAW-[Member Services Corporation]. BIAW-[Member Services Corporation] does not hold board meetings of its board of directors or executive committee separate from BIAW board and executive committee meetings. BIAW-[Member Services Corporation] and BIAW have a consolidated budget. Not all members of the BIAW board and/or executive committee were aware that they also serve on the board and/or executive committee of BIAW-[Member Services Corporation].

. . . .

57. BIAW-[Member Services Corporation] performed the administrative services for [WBB Trust].

. . . .

64. The trustees allowed BIAW-[Member Services Corporation] to administer trust funds. The trustees did not expressly delegate to BIAW-[Member Services Corporation] trust duties but, rather, acquiesced in this arrangement.

CP at 7141, 7143-47, 7152-53. Taken together, these unchallenged findings of fact support the trial court's conclusion that all of the Trustees had trust duties that they breached by commingling trust funds, by retaining interest on trust funds, and by failing to provide annual accountings as required by statute.

■ ¶61 Moreover, under the terms of the ROII enrollment agreements establishing the trust, BIAW accepted trust duties that continued from the time that it received Department refunds on behalf of employer participants until it distributed those returns to the beneficiaries of the trust. Although BIAW reserved the right to delegate respon-

sibilities to its subsidiaries BIAW-Member Services Corporation and the WBB Trust, as "a trustee [BIAW could not] properly transfer the trust property to another as trustee and thereby abdicate responsibility." RESTATEMENT (THIRD) OF TRUSTS § 80 cmt. c (2003); *see also* RESTATEMENT (THIRD) OF TRUSTS § 81 cmt. a (providing that, in general, all cotrustees are bound by fiduciary duties except as modified by the trust's terms, and that each trustee has a duty of care to prevent cotrustees from committing a breach of trust); *Meck v. Behrens*, 141 Wash. 676, 685, 252 P. 91 (1927) ("[T]he trustee who has placed the trust property in the hands of others will not, after the property has been lost, be heard to say that the delegation of power was not responsible for the loss."). The same is true for the named WBB Trust trustees that delegated duties to BIAW-Member Services Corporation.

¶62 And conversely, by "accepting the delegation of a trust function from a trustee," the BIAW subsidiaries, BIAW-Member Services Corporation and the named WBB Trust trustees, "assume[d] a fiduciary role with fiduciary responsibilities." RESTATEMENT (THIRD) OF TRUSTS § 80 cmt. g. Thus, BIAW-Member Services Corporation and named trustees of the WBB Trust "ha[d] a duty to the trust and its beneficiaries to act with reasonable care . . . in performing a delegated function and in complying with the instructions and other provisions in the terms of the delegation, with potential liability for breach of duty." RESTATEMENT (THIRD) OF TRUSTS § 80 cmt. g. Accordingly, we hold that the trial court did not err by concluding that all trustee entities breached the trust by commingling trust funds, retaining interest on trust funds, and failing to provide annual accountings to the beneficiaries.

E. Exculpatory Clauses

¶63 Next, the Trustees contend that the trial court erred in its final order and judgment by failing to give effect to exculpatory provisions in the ROII enrollment agreements. We disagree.

¶64 Generally, a "trustee owes to the beneficiaries . . . the highest degree of good faith, care, loyalty, and integrity." *Allard v. Pac. Nat'l Bank*, 99 Wn.2d 394, 403, 663 P.2d 104 (1983). But in drafting the terms of a trust, the settlor may limit or modify a trustee's liability. *Baldus v. Bank of Cal.*, 12 Wn. App. 621, 627, 530 P.2d 1350 (1975). For example, the trustee's duty to exercise reasonable care and skill in administering the trust "may be relaxed or modified" and the trustee may be relieved of liability for a breach of trust. RESTATEMENT (SECOND) OF TRUSTS § 174 cmt. d, § 222 (1959); *see also* RESTATEMENT (THIRD) OF TRUSTS § 96.

¶65 But exculpatory trust provisions "are strictly construed, and the trustee is relieved of liability only to the extent to which it is clearly provided." RESTATEMENT (SECOND) OF TRUSTS § 222 cmt. a; *see also* RESTATEMENT (THIRD) OF TRUSTS § 96 cmt. b. And former RCW 11.97.010 (2003) provides in relevant part, "The trustor of a trust may by the provision of the trust relieve the trustee from any or all of the duties, restrictions, and liabilities which would otherwise be imposed by [statute.[18]] In no event may a trustee be relieved of the duty to act in good faith and with honest judgment."

¶66 The ROII enrollment agreements provide:

**Limitations of Liability and Indemnification.** The Member hereby releases and agrees to indemnify and hold BIAW, its subsidiary, the Trust, and all of the members of the Trust harmless from any and all liability for any decision which may now or hereafter by [sic] made by BIAW, its subsidiary, or· the Trust with regard to the Plan, any Premium Returns (including interest, principal and profit), the payment of any such sums or the investment of any such sums.

CP at 84.

¶67 Here, the trial court concluded that the Trustees' exculpatory clauses were enforceable except in regard to

---

[18] Former RCW 11.97.010 does not permit a settlor to relieve the trustee of its duty to provide beneficiaries with accounting statements under chapter 11.106 RCW.

Participants' claims that Trustees failed to exercise good faith or acted in violation of the duty to provide beneficiaries with accounting statements under chapter 11.106 RCW. The Trustees do not argue that the trial court's conclusion in this regard was an incorrect statement of law but, instead, argue that certain findings of fact did not support the trial court's ultimate conclusion that the Trustees failed to exercise good faith when they commingled trust funds, failed to provide annual accountings, and retained inbound and outbound interest that belonged to the trust beneficiaries.

¶68 Specifically, the Trustees argue that the trial court's findings indicated that they had acted in good faith and, thus, the exculpatory provisions should have shielded them from liability. But the findings of fact that Trustees assert fail to support the trial court's conclusions because those findings either have no relation to the Trustees' supposed good faith conduct[19] or relate to the Trustees' prudent investment decisions,[20] neither of which is relevant to the issue of whether they acted in good faith when improperly commingling trust funds, retaining interest, and failing to provide annual accountings. Thus, the Trustees' contention that the trial court erred by failing to enforce the agreements' exculpatory clauses is without merit.

II. PARTICIPANTS' APPEAL

¶69 The Participants first contend that the trial court erred at summary judgment by finding that the flat 10

---

[19] For example, finding of fact 54 states:

The value of the services that BIAW[-Member Services Corporation] provides to [the] WBB[ Trust] is unknown. Although the value is generally substantial, there has been no presentation of contemporaneous records, forensic accounting, or other documentation of the actual value of BIAW[-Member Services Corporation]'s trust administration services. It is not clear from the testimony and exhibits what services precisely are provided solely for the enrollment fee.

CP at 7151.

[20] Finding of fact 37 states, "The [T]rustees made sound decisions regarding investments and expenditures authorized by the [T]rustees when trust funds were in Wells Fargo investment accounts." CP at 7148.

percent marketing assistance fee to BIAW and additional 10 percent marketing assistance fee to the local associations did not violate the trust terms. The Participants also argue that the Trustees violated their trust duties by spending the marketing assistance fees on activities not provided for in the trust and that the trial court's failure to so find was legal error. In the alternative, they argue that remand is necessary for trial on the material issue of fact of how the Trustees spent the fees and what portion was spent for marketing and promotion and what portion was spent contrary to the trust agreement. We agree that remand is necessary for further proceedings to identify whether the Trustees' expenditures of transferred fees were for marketing and promotion of the ROII program and a determination of relief due the Participants if the expenditures violated the trust agreement.

## A. Standard of Review

¶70 Interpretation of a will or trust instrument is a question of law we review de novo. *In re Estate of Curry*, 98 Wn. App. 107, 112-13, 988 P.2d 505 (1999). In construing the terms of a trust, the settlor's intent controls. *Eisenbach v. Schneider*, 140 Wn. App. 641, 651, 166 P.3d 858 (2007). When possible, we determine the settlor's intent from the language of the trust instrument as a whole, giving effect to each part of the trust instrument. *In re Estate of Sherry*, 158 Wn. App. 69, 78, 240 P.3d 1182 (2010); *Eisenbach*, 140 Wn. App. at 651. Although, in general, determining a settlor's intent is a question of fact, the interpretation of a trust provision is a question of law. *Sherry*, 158 Wn. App. at 76; *Eisenbach*, 140 Wn. App. at 651. And if a trust's language is unambiguous, the trust does not require either interpretation or construction. *Templeton v. Peoples Nat'l Bank of Wash.*, 106 Wn.2d 304, 309, 722 P.2d 63 (1986) (quoting 90 C.J.S. *Trusts* § 161, at 18-19 (1955)). A trust term is not ambiguous unless the language is susceptible to more than one reasonable interpretation. *Waits v. Hamlin*, 55 Wn. App.

193, 200, 776 P.2d 1003 (1989). Accordingly, where a trust's language is unambiguous, we cannot alter the settlor's intent by interpreting or construing the language used otherwise. *Templeton,* 106 Wn.2d at 309.

B. Transfer of Marketing Assistance Fees

¶71 Here, the trial court found on summary judgment that the ROII's plain language unconditionally authorized the Trustees to transfer 10 percent of the employer beneficiaries' Department refunds to BIAW and an additional 10 percent to local affiliates. The relevant provision of the enrollment agreements provided, "The Member further authorizes the Trustees to transfer ten percent (10%) of the Participants' Premium Returns applicable to the Coverage Period to local associations and 10% to BIAW *for marketing and promotion of the Plan.*" CP at 83 (emphasis added).

¶72 The Participants argue on appeal, as they did before the trial court, that the phrase "for marketing and promotion of the Plan" restricts the Trustees from transferring funds unless needed and used for marketing and promotion expenses. CP at 83. We disagree. As the trial court correctly found, the enrollment agreements' plain and unambiguous language concerning the flat 10 percent transfer of Department refunds to BIAW and an additional 10 percent transfer to local associations was not subject to any condition. Accordingly, we hold that the Trustees did not breach any trust duties by merely transferring marketing assistance fees out of the trust accounts the trust instrument authorized and, thus, the trial court did not err by granting summary judgment on that issue.

C. Use of Marketing Assistance Fees

¶73 But that the Trustees did not violate the trust's terms by *transferring* marketing assistance fees to BIAW and the local associations does not resolve whether the Trustees violated their trust duties by *spending* the trans-

ferred marketing assistance fees on activities unrelated to marketing and promoting the ROII program. Although, as we addressed above, the phrase "for marketing and promotion of the Plan" does not condition the *transfer* of fees, it plainly and unambiguously limits the *use* of such fees once transferred. CP at 83.

¶74 The trial court found in its September 13 partial summary judgment order and letter opinion that the Participants' evidence showed that BIAW used only a small percentage of the approximately $16 million dollars it retained or transferred as fees for marketing and promotion of the ROII plan, and that the Trustees "d[id] not argue that the ten percent fees were wholly used solely for marketing and promotion of the [P]lan." CP at 5010.

¶75 Although we agree with the trial court that " 'marketing and promotion of the [P]lan' may be construed very broadly to encompass many activities," the trial court's interpretation allowing BIAW to use these funds for any purpose essentially writes the phrase "for marketing and promotion of the [P]lan" out of the trust instrument. CP at 5010. And this interpretation is contrary to the well-established principle that courts must give effect to each part of the trust instrument. *Sherry*, 158 Wn. App. at 78.

¶76 We hold that the plain language of the ROII agreement unambiguously required BIAW to spend the transferred fee "for marketing and promotion of the Plan." CP at 83. Thus, the trial court's findings regarding Participants' evidence and the BIAW defendants' admission that these fees had not been spent on marketing and promotion of the plan created a genuine issue of material fact for trial on the exact amount and nature of the Trustees' expenditures from the retained fees. We hold that the trial court erred by granting summary judgment on this issue.

¶77 Accordingly, we vacate that portion of the summary judgment order finding that the Trustees did not violate trust duties through their use of marketing assis-

tance fees and remand to the trial court.[21] On remand, if the fact finder determines that the Trustees violated trust duties by expending marketing assistance funds on activities unrelated to marketing and promoting the ROII plan, it need also determine whether the Trustees failed to act with good faith and with honest judgment in doing so when evaluating whether to impose liability on the Trustees in light of the enrollment agreements' exculpatory clause.

### D. Timing of Marketing Assistance Fee Transfers

¶78 The Participants also contend that the trial court erred by finding on summary judgment that the Trustees did not violate the trust through the timing of the marketing assistance fee transfers. Specifically, the Participants argue that the 1994 Declaration of Trust restricted the Trustees from transferring marketing assistance fees until they fully distributed refunds in year three of the plan. We disagree and affirm the trial court's summary judgment order on this issue.

¶79 The trust provision contained in the 1994 Declaration of Trust at issue provides:

Section 11. Before distribution of the balance of each Fund left after payment of all expenses and final Adjustments by [the Department], the Trustees shall to [sic] pay to BIAW a marketing assistance fee of 10% of all Employer Participants' distributive shares of the Fund. In addition, the Trustees shall pay to any local association with members who are Employer Participants in a Plan a marketing assistance fee of 10% of the distributive share of the Fund allocated to Employer Participants who are members of such local association.

CP at 211-12.

---

[21] Because, as will be addressed below, the trial court properly found that the ROII enrollment agreements did not impose trust duties on the Master Builders Association and, thus, properly dismissed the Master Builders Association, and because the Participants do not challenge the trial court's dismissal of the other local associations as defendants, we do not address the propriety of local associations' use of their 10 percent marketing assistance fees.

¶80 The Trustees transferred marketing assistance fees to BIAW and to local associations in installments in the same manner in which they distributed refunds to ROII employer participants: 70 percent at the close of the first adjustment, 20 percent at the close of the second adjustment, and 10 percent at the close of the third and final adjustment. Although the trust language indicates that marketing assistance fees are not to be transferred until "*after* [the Department's] *final* Adjustments," the trial court properly interpreted that language to mean the Department's final yearly adjustment, not the Department's third and final adjustment in the year three following the program year. CP at 211 (emphasis added). The Participant's assertion that this language restricts Trustees from paying these fees until after the Department's third and final adjustment in year three following the program year is contrary to the language of the provision providing that these fees are paid "[*b*]*efore* distribution" of the refunds to the employer participants. CP at 211 (emphasis added).

¶81 Thus, as the trial court correctly found on summary judgment, the trust provision regarding the timing of marketing assistance fee payments allowed the Trustees to transfer the fees in the same manner in which they proportionally distributed Department refunds to the ROII employer participants. Accordingly, we affirm that portion of the trial court's summary judgment order.

E. Dismissal of Master Builders Association

¶82 Next, the Participants assert that the trial court erred by entering an order granting the Master Builders Association's CR 12(c) motion for judgment on the pleadings and dismissing the Master Builders Association. We disagree and affirm the trial court's grant of the Master Builders Association's CR 12(c) motion.

¶83 CR 12(c) provides:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the

pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by rule 56.

¶84 We review de novo a trial court's decision on a motion on the pleadings. *Gaspar v. Peshastin Hi-Up Growers*, 131 Wn. App. 630, 634, 128 P.3d 627 (2006). A motion to dismiss for failure to state a claim under CR 12(b)(6) and a motion for judgment on the pleadings under CR 12(c) raise identical issues and are subject to the same standard of review. *Gaspar*, 131 Wn. App. at 634-35. Under either rule, dismissal is appropriate only if it is beyond doubt that the plaintiff can prove no facts that would justify recovery, considering even hypothetical facts outside the record. *Gaspar*, 131 Wn. App. at 635.

¶85 The Participants assert that the trial court erred in granting the Master Builders Association's CR 12(c) motion because (1) unlike the other dismissed local associations, the Master Builders Association participated in the creation of the trust and (2) regardless of whether the Master Builders Association owed the Participants fiduciary duties, it is still accountable to the trust for funds due to the Trustees' breach of the trust. The Participants fail to cite legal authority supporting the proposition that trust duties are imposed on parties that merely assist another party in creating a trust, and they cite no evidence in the record that the Master Builders Association is responsible for the predecessor organization's conduct.

¶86 As addressed above, we determine whether trust instruments impose fiduciary duties on a party by examining the trust instrument's language. *Westview*, 133 Wn. App. at 846. And here, there is no language in the trust instruments indicating that the Master Builders Association or any other local association would hold trust property for the benefit of the Participants or other ROII employer

participants. Accordingly, the Participants' first assertion fails.

¶87 We have determined above that the Trustees did not violate their trust duties by transferring marketing assistance funds to the local associations. Thus, there is no breach of trust for which the Master Builders Association became responsible and the Participants' second assertion fails. Accordingly, we affirm the trial court's grant of the Master Builders Association's CR 12(c) motion for judgment on the pleadings.

F. Remedy for the BIAW Defendants' Breach of Fiduciary Duties

¶88 The Participants further argue that the trial court erred in its final judgment by failing to order the Trustees to disgorge funds that the trial court found the Trustees improperly retained in violation of trust duties owed to the beneficiaries and to restore those funds to the trust corpus. We agree.

¶89 The trial court concluded that the Trustees breached their trust duties by commingling trust funds with their own funds, by retaining approximately $400,000 interest earned on trust funds, and by failing to provide beneficiaries with statutorily required annual accountings. But, despite its finding that the Trustees breached their fiduciary trust duties, the trial court did not order the Trustees to return the approximately $400,000 interest earned on trust funds that the Trustees wrongly retained, reasoning that "damages to each of the petitioners [was] not in significant amounts and that the trustees primarily exercised sound discretion and maintained the trust on behalf of the beneficiaries." CP at 7155. This was error.

¶90 Under chapter 11.106 RCW, it is irrelevant whether the Participants themselves suffered a significant economic injury. Instead, in fashioning relief for a trustees' breach of duty, the trial court was to determine, "if so requested by one or more of the parties," the "validity and

propriety of *all actions of the trustee or trustees,*" not just those actions that affected the Participants; and the trial court must "surcharg[e] the trustee or trustees for *all losses* . . . caused by negligent or wilful breaches of trust." RCW 11.106.070 (emphasis added); *see also* RESTATEMENT (SECOND) OF TRUSTS § 205 ("If the trustee commits a breach of trust, he is chargeable with . . . any profit made by him through the breach of trust."). Thus, in fashioning relief for a trustee's breach of trust, the trial court must determine the remedy that will restore the loss to the trust, not the loss to the individual Participants, caused by the trustee's breach.

¶91 Further, it is a " 'well settled rule that a trustee can make no profit out of his trust.' " *In re Estate of Montgomery*, 140 Wash. 51, 54, 248 P. 64 (1926) (quoting *Magruder v. Drury*, 235 U.S. 106, 119, 35 S. Ct. 77, 59 L. Ed. 151 (1914)). And here, by failing to order the Trustees to return the improperly retained interest on trust funds, the trial court has allowed the Trustees to profit from their breach of fiduciary duties to the trust beneficiaries as a whole. Accordingly, we reverse that portion of the trial court order concluding that the Trustees were not required to return improperly retained trust funds to the trust corpus and remand for further proceedings to calculate the amount of retained interest, the repayment schedule, and the amount of interest due to the WBB Trust on the amount to be repaid.

III. ATTORNEY FEES

¶92 Participants, Trustees, and respondent/cross appellant Master Builders Association all assign error to the trial court's order denying motions for attorney fees and costs. We reverse in part and affirm in part.

A. Standard of Review—Contract

¶93 "Under the American rule compensation for attorney fees and costs may be awarded only if authorized

by contract, statute, or a recognized ground in equity." *In re Impoundment of Chevrolet Truck*, 148 Wn.2d 145, 160, 60 P.3d 53 (2002). We apply a two-part standard of review to a trial court's award or denial of attorney fees: "(1) we review de novo whether there is a legal basis for awarding attorney fees by statute, under contract, or in equity and (2) we review a discretionary decision to award or deny attorney fees and the reasonableness of any attorney fee award for an abuse of discretion." *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

¶94 Trustees and the Master Builders Association both asserted at trial that they were entitled to attorney fees and costs under a provision of the enrollment agreements providing, "In the event BIAW or the Trust is required to hire legal counsel to enforce the Member's obligations under this Agreement, the Member agrees to pay all legal fees and cost incurred by the Trust or BIAW in any action or proceeding." CP at 84.

¶95 First, under the enrollment agreements' plain language, the Master Builders Association was not entitled to enforce an attorney fees provision that applies to "fees and costs incurred by the [WBB] Trust or BIAW." CP at 84. The Master Builders Association is neither the BIAW nor the WBB Trust. Accordingly, the trial court did not err by failing to award the Master Builders Association attorney fees under that provision.

¶96 Second, the trial court also did not err by failing to award the Trustees' motion for attorney fees under that contract provision because by its plain language it applied only to attorney fees and costs incurred for "enforc[ing] the Member's obligations." CP at 84. Here, the Trustees did not incur attorney fees and costs to enforce the Participants' obligations under the enrollment agreements but, rather, incurred costs to defend the Participants' claim that the Trustees breached their trust duties. Accordingly, the trial court did not err by failing to award the Trustees attorney fees under the contract.

¶97 Moreover, based on the contract language, Participants are entitled to attorney fees for enforcing the Trustees' duties under the trust agreement. Former RCW 4.84.330 (1977); *Wachovia SBA Lending, Inc. v. Kraft*, 165 Wn.2d 481, 493, 200 P.3d 683 (2009). Because Participants prevailed on their claims that the Trustees breached their fiduciary duties in three ways, the trial court abused its discretion in failing to award fees at trial on those claims. They are also entitled under the agreement to fees for prevailing on their claim that the Trustees must disgorge interest wrongfully retained. We remand for determination of those fees.

B. Standard of Review—Trust and Estate Dispute Resolution Act

¶98 All of the parties also asserted at trial that they were entitled to attorney fees and costs under a provision of the Trust and Estate Dispute Resolution Act (TEDRA), RCW 11.96A.150(1), which provides in part:

> Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

RCW 11.96A.150 provides both the trial court and this court with broad discretion to award attorney fees in a trust dispute. *In re Estate of Frank*, 146 Wn. App. 309, 327, 189 P.3d 834 (2008).

¶99 Accordingly, we review the trial court's award or denial of attorney fees under RCW 11.96A.150 for an abuse

of discretion. A trial court abuses its discretion if its decision to award or deny attorney fees under RCW 11.96A.150 is manifestly unreasonable or based on untenable grounds or reasons. *Black*, 153 Wn.2d at 173.

## C. Master Builders Association

¶100 Although the Participants' claims against the Master Builders Association were ultimately unsuccessful, the trial court denied the Master Builders Association's request for attorney fees under the TEDRA statute because it found that the Participants' claims "were not frivolous," contrary to the Master Builders Association's assertion on appeal that the Participants' claims against it "had no sound legal or factual basis." CP at 8112; Br. of Resp't/Cross-Appellant Master Builders Association at 20. And because RCW 11.96A.150 vests broad discretion in the trial court to deny attorney fees for "any and all factors that [the trial court] deems to be relevant and appropriate," the trial court did not abuse its discretion by denying the Master Builders Association's request for attorney fees on that basis.

## D. Trustees

¶101 The trial court also denied the award of attorney fees based on its finding that the litigation raised unique issues. *In re Estate of D'Agosto*, 134 Wn. App. 390, 402, 139 P.3d 1125 (2006). We agree. And we hold that the trial court did not abuse its discretion in denying the Trustees' motion for attorney fees because the Participants succeeded on claims against the Trustees for multiple breaches of fiduciary duties owed to the WBB Trust's beneficiaries.

## E. Participants

¶102 The trial court's denial of attorney fees to the Participants rested in part on its findings that the Participants did not prevail on several of their claims. But we reverse the trial court's rulings regarding the disgorgement

of the improperly retained interest and remand for further proceedings on the genuine issue of material fact about whether the Trustees breached the terms of the trust by spending the marketing assistance fees on activities unrelated to "marketing and promotion of the [P]lan," as required under the agreement establishing the Trustees' trust duties. CP at 5010.

¶103 Furthermore, the Participants' claims result in at least $400,000, plus the interest still to be calculated, being returned to the trust corpus, a clear benefit to the WBB Trust. Thus, we hold that the Participants are entitled to attorney fees at trial and on appeal for those claims on which they prevailed at trial, i.e., the Trustees' violation of their fiduciary duties to not commingle funds, to not retain earned interest, and in failing to provide accountings of the trust funds. In addition, the trial court should revisit the Participants' request for attorney fees after its determination of issues on remand. Accordingly, we affirm the trial court's denial of attorney fees and costs to the Master Builders Association and Trustees, and vacate the trial court's denial of Participants' motion for attorney fees on those claims on which they have prevailed. We remand for determination of the fees to Participants on issues on which they have already prevailed at trial.

### F. On Appeal

¶104 Each of the parties also asserts that it is entitled to attorney fees on appeal. On appeal, RAP 18.1(a) authorizes the award of attorney fees where "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." Additionally, a contract provision awarding attorney fees at trial may authorize the award of such fees on appeal. *Boyd v. Davis*, 127 Wn.2d 256, 264, 897 P.2d 1239 (1995).

¶105 A request for appellate attorney fees requires a party to include a separate section in his or her brief devoted to the request. RAP 18.1(b). This requirement is

mandatory. *Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 705, 915 P.2d 1146 (1996). This rule requires "more than a bald request for attorney fees on appeal." *Thweatt v. Hommel*, 67 Wn. App. 135, 148, 834 P.2d 1058 (1992). Rather, argument and citation to authority are required under the rule to advise this court of the appropriate grounds for an award of attorney fees and costs. *Austin v. U.S. Bank of Wash.*, 73 Wn. App. 293, 313, 869 P.2d 404 (1994).

¶106 Because the Trustees were unsuccessful in their cross appeal against the Participants and because the Participants succeeded in most of their appellate issues against the Trustees, there is no basis to award the Trustees appellate attorney fees under RAP 18.1 and RCW 11.96A.150.

¶107 Although we affirm the trial court's denial of the Master Builders Association's motion for attorney fees at trial, we may, in our discretion under RCW 11.96A.150, grant requests for attorney fees on appeal. Here, the Participants argued that the trial court erred in granting the Master Builders Association's CR 12(c) motion for judgment on the pleadings because (1) the Master Builders Association participated in the creation of the trust and (2) the Master Builders Association was liable for the Trustees' breach of trust. As addressed above, the Participants failed to cite legal authority for its proposition that the Master Builders Association was liable for a breach of trust based on its mere participation in creating the trust and in the absence of any indication in the trust instrument that the Master Builders Association had trust duties to the beneficiaries. But the Participants did support their second assertion—that the Master Builders Association was at least partially complicit with or liable for the Trustees' breach of trust—with adequate argument and citations to legal authority, although it did not succeed on that claim. Accordingly, we deny the Master Builders Association's request for attorney fees on appeal.

¶108 We regard the Participants as the substantially prevailing party on appeal and recognize that they provided

benefit to all trust beneficiaries, even though the Participants no longer reap the benefits of their actions because BIAW excluded them from participation in the ROII program after the Participants pursued this litigation. Thus, under former RCW 4.84.330 and RCW 11.96A.150, we award the Participants their fees and costs on appeal. The amount shall be determined by our commissioner after the Participants comply with RAP 18.1.

HUNT, J., and BRIDGEWATER, J. PRO TEM., concur.

Review denied at 177 Wn.2d 1018 (2013).