# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CORY NEWINGHAM, | No. 48818-3-II |
| Respondent, | |
| v. | |
| JOHN NEWINGHAM, KRISTIE NEWINGHAM, and VELOCITY CNC MACHINING, INC., | UNPUBLISHED OPINION |
| Appellants. | |

LEE, J. — John and Kristie Newingham, as husband and wife, and Velocity CNC Machining, Inc., a Washington corporation, appeal the trial court's findings of fact and conclusions of law. They argue that the trial court erred when it (1) found that all parties were properly served; (2) concluded that the tort of defamation was not established; (3) concluded that the tort of intentional infliction of emotional distress was not established; and (4) concluded that no new contract to pay commissions was entered into. We affirm.

No, 48818-3-II

FACTS

A.    FACTS RELEVANT TO CORY'S CLAIMS

    1.    Cory and Velocity

John Newingham and Cory Newingham are brothers. In August 2012, John[1] incorporated his own business, Velocity CNC Machining, Inc. (hereinafter "Velocity"). John is Velocity's president and registered agent, and Kristie is its vice president.

John hired Cory as general manager of Velocity. John, on behalf of Velocity, also offered to pay Cory a 10 percent commission for every customer that Cory brought in for as long as the customer did business with Velocity. Cory accepted the offer by sending out e-mails and began looking for new customers.

Cory testified that there was no termination date to the commission agreement and that his position as general manager of Velocity was separate from the commission agreement. John testified that he made the commission offer to Cory, but the commission payments would stop if Cory's employment at Velocity was terminated.

The commission agreement was not put in writing. Ronnie Newingham, John and Cory's father, testified that he was not sure if a contract ever existed, but John "offered that 10 percent commission to a couple people and Cory was the only one that took him up on it." 1 Verbatim Report of Proceedings (VRP) at 104.

---

[1] Because the appellant, respondent, and many of the witnesses have the same last name, we use their first names for clarity with no disrespect intended.

Cory continued to find customers for Velocity in addition to his role as general manager. On September 19, 2014, after the brothers had an argument, John terminated Cory's employment with Velocity.

2.      Family Meeting

On September 21, Ronnie called a family meeting at Cory's house to see if Cory could remain at Velocity because Cory was distraught. Ronnie testified that he received a call from Amanda Newingham, Cory's wife, saying Cory was threatening suicide and asked John to talk to Cory. He set up a meeting after that. Ronnie, John, Cory, Amanda, and their brother-in-law, Russell Ferguson, attended the meeting.

John stated that he went over to Cory's house because he was told that Cory was threatening suicide. Cory denied ever threatening to commit suicide. Ferguson also testified that he did not hear Cory make any mention of suicide.

Shortly after John got to the house, he said Amanda started screaming at him. John tried to leave, but Ronnie grabbed his arm and asked him to stay. John said there was no way he was going to let Cory go back to work. However, he did agree to continue paying Cory's commission in order to get him on his feet, but he did not say for how long. John agreed to continue to pay commissions because Cory was threatening suicide, Ronnie was upset, Ferguson was upset, and "the only way to make the situation better was to offer some help." 1 VRP at 140. Ronnie testified that John wanted to work out a peaceful separation at the meeting and offered to continue to pay Cory's commission. Ronnie said no one forced John to pay Cory the commissions. Ferguson also testified that no one forced John to pay Cory the commissions. John subsequently paid Cory two commission checks and then stopped.

3

3.     Service of Process

On January 9, 2015, Cory filed a lawsuit against John, Kristie, and Velocity alleging a breach of oral contract and other claims. The summons and complaint was served on John and Kristie's 15-year-old daughter at their residence in Orting, Washington.

On January 16, defense counsel filed a notice of appearance on behalf of John, Kristie, and Velocity. The notice of appearance specified "to serve all future pleadings or papers, except process, upon said attorney at his address below stated." Clerk's Papers (CP) at 14.

On February 24, Cory filed an amended complaint. The amended complaint was an exact copy of the original complaint except for the inclusion of the cause number assigned by the trial court. The amended complaint was mailed to John, Kristie, Velocity, and their attorney via first class mail. John signed the certified return receipt.

On April 9, John, Kristie, and Velocity responded by filing an answer and counterclaims alleging defamation, intentional infliction of emotional distress, and tortious interference with a business expectancy. As an affirmative defense, they claimed that Cory failed to "serve process" on them "in the manner and form required by law." CP at 57.

B.     FACTS RELEVANT TO COUNTERCLAIMS

1.     John's Relationship with Kaycee Stackle

In 2003, John lived with Scott and Kaycee Stackle for a few months. Scott and Kaycee were married at the time. While living with Scott and Kaycee, John and Kaycee had sexual relations. And John admitted to having sexual relations with Kaycee while she was married to Scott.

4

John and Kaycee stopped having sexual relations when John moved out and he began dating Kristie. John never told Kristie, nor anyone else, about his sexual relations with Kaycee.

2.      Disclosure of Affair

Cory suspected something was going on between John and Kaycee around the time of the affair, but did not know exactly what was going on. He had seen a text message between John and Kaycee about something they had done the night before, but John told him to not say anything about it. Cory definitively found out about John and Kaycee's sexual relations through Amanda, whom Kaycee spoke to when the affair occurred.

From October to December of 2014, Cory sent John text messages that he was going to expose the affair. Cory also sent threatening text messages to John. Cory eventually posted online about John and Kaycee's affair and he told Scott as well. John testified that Cory posted information online about his affair with Kaycee in retaliation for being fired.

3.      Effects of Disclosure

Scott had suspicions about Kaycee having an affair during the time it occurred, but he did not make any accusations because he did not know for sure. Scott found out about the affair around October 2014 from Cory and the online post.

Scott owned Sakco Precision, a manufacturing company. Scott and John did business together. But Scott stopped doing business with John about six months before Scott found out about the affair between John and Kaycee.

However, John testified that when Scott found out about his and Kaycee's affair, Scott stopped doing business with him. He also said in addition to sending him threatening messages,

Cory tried to swerve his car into his and flipped him off. Also, John no longer got invited to family events.

    4.      Counterclaims

John, Kristie, and Velocity filed counterclaims against Cory, including slander, libel, defamation, outrage, and tortious interference with business activities. Velocity specifically prayed for damages arising from its claim of interference with business relationships.

C.     TRIAL

    1.      Motion to Dismiss

The case proceeded to a bench trial. Midway through trial, John, Kristie, and Velocity brought a motion to dismiss, alleging improper service of process. They argued that service of the summons and complaint on John and Kristie's 15-year-old daughter was insufficient to invoke jurisdiction over each of them, as was mailing the amended complaint.

The trial court denied the motion to dismiss as to John and Kristie because they were properly served. The trial court also denied the motion as to Velocity because (1) the original summons and complaint was served on John as Velocity's registered agent, through his daughter; and (2) the amended complaint was served on John as Velocity's registered agent by mail, even without court permission to do so, as John accepted service by signing the certified return receipt.

    2.      Trial Court's Findings and Conclusions

After considering the evidence and testimony, the trial court found that:

1(A). All parties were properly served.

. . . .

7.      At this time, through its president John, Velocity made an offer to Cory and others to pay commissions for obtaining new customers for Velocity. Only Cory accepted the offer.

8.      The offer included the following relevant terms: Cory would immediately begin to solicit new business for Velocity; Cory would receive a ten percent commission on all invoices paid by each client who was brought to Velocity by Cory's solicitation; and, the commissions would be paid so long as Velocity did business with and performed services for customers that were brought to Velocity by Cory's efforts.

. . . .

10.      The testimony is undisputed that both parties anticipated and expected that this arrangement and agreement would be long-term. After all, they were brothers. Even though John was acting in his capacity as president of Velocity, both expected that they would make significant money if Cory was successful in bringing in new clients.

. . . .

12.      It is also undisputed that once the offer was made and accepted, Cory immediately began to procure clients for Velocity, and this procurement continued for approximately one and three quarter years, i.e., from November 2012 until September 2014.

13.      It's also undisputed that Cory procured these clients under the terms of the parties' oral understanding and agreement, even though Cory was employed full time at Staffmark.

. . . .

24.      According to John, the volume of the anticipated work would bring large commission checks to Cory and significant business to Velocity.

. . . .

28.      Also at this meeting John confirmed and reaffirmed that he would continue to pay Cory commissions for an indefinite period of time as originally agreed.

29.      Pursuant to the offer made at the meeting, Velocity sent a commission contract for signature to Cory in October of 2014.

30. The contract contained different terms than the November 2012 agreement.

31. Because Cory did not agree to the new terms, Cory refused to sign the contract.

. . . .

38. It is also undisputed that there was an affair. John was not married, but Kaycee was married to Scott at the time of their affair.

39. It is also undisputed that others knew or suspected of the affair, including Amanda Newingham, Cory Newingham, and Scott Stackle.

. . . .

41. The relationship of the affair to John and Kristie, whether they were living together, dating, not dating, not seeing each other, is of no legal consequence.

42. Whether the affair continued during the time John was living with Kristie or occurred only after John and Kristie resumed their relationship is of no legal consequence.

43. John and Kaycee had an affair. There was no other way to re-spin what is undisputed occurred. There was an affair. John never told his now wife Kristie.

44. There was no evidence of how Cory's disclosure of the affair defamed John and Kristie other than to reveal that which John had not told Kristie or others about.

. . . .

48. It is undisputed that both John and Cory spoke, e-mailed, and sent text messages to each other that were hurtful and unnecessary concerning John's affair, Velocity's termination of Cory's general manager position, and over Velocity's failure to honor the commissions contract.

. . . .

51. As a result of Cory's revelation of the affair and defendants' breach of the commission contract as well as termination of Cory's employment as Velocity's general manager, the Newingham family is now at odds. Marriages and family relationships have been affected. Friendships have been lost. Attendance at family social events have been affected for everyone. Everyone is responsible for this dysfunction. Everyone is too proud, too stubborn, too polarized, too angry, and has

said too many regretful things for the family to self-repair, even as Ronnie Newingham's health continues to deteriorate.

52.     There is a failure of proof that Cory intended to inflict emotional distress on John or Kristie individually, and there is no such tort available for Velocity.

The trial court then concluded:

1.     Velocity, through its president John made an offer to Cory to pay commissions on all clients that Cory acquired for Velocity and who continued to do business with Velocity. Cory accepted the offer by performance. Consideration on Cory's part was his acquisition of new clients. On Velocity's part, consideration consisted of payment of the promissed [sic] commissions. Velocity and Cory had a binding oral contract.

. . . .

4.     While John's post-termination offer to continue to pay commissions to Cory is asserted to have been made under duress, a new and different commission contract was never formed after Cory was terminated from Velocity.

5.     Damages are awarded for a breach of contract to protect a party's reasonable expectation. *Veritas Operating Corp. v. Microsoft Corp.*, 2008 U.S. Dist. LEXIS 112135, 11-13 (W.D. Wash. Feb. 26, 2008). "For cases in which profits are the inducement for entering into a contract, lost profits are the proper measure of damages for a breach of contract if they can be proven with reasonable certainty." *Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 389 (1985). Plaintiff Cory Newingham had a reasonable expectation that he would receive a 10% commission *ad infinitum* for his role in building Velocity's business. Plaintiff is entitled to the average monthly commission for 36 months. The total lost profits is $49,924.08.

6.     A court has the authority to award prejudgment interest if the amount due is liquidated, or the amount is based on a specific contract for the payment of money and "the amount due is determinable by computation with reference to a fixed standard." *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32 (1968). The amount due is liquidated. The interest rate is 12% per annum. Thus prejudgment interest totals $5,990.89.

7.     Defendants counter claimed [sic] for defamation. A defamation plaintiff must establish four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005). Defendants have failed to establish falsity because it is undisputed that John had an

affair with Kaycee Stackle who was married at that time to Scott Stackle. There is also a failure of proof on the element of damages.

. . . .

9. Defendants counterclaimed for Intentional Infliction of Emotional Distress. John and Cory exchanged words, e-mails, and text messages that were hurtful and unnecessary to each other over the termination of the commission contract and Cory's general manager position as well as over Cory's revelation of John and Kaycee's affair. As a result, family relationships have been damaged and friendships have been lost. Everyone is responsible for this dysfunction. Everyone is too proud, too stubborn, too polarized, too angry, and has said too many regretful things for the family to self-repair, even as Ronnie Newingham's health continues to deteriorate. However, there is a failure of proof that Cory intended to inflict emotional distress on John or Kristie individually, and there is no such tort available for Velocity.

CP at 274-82. John, Kristie, and Velocity appeal.

## ANALYSIS

A. STANDARD OF REVIEW

We review a trial court's findings of fact for substantial evidence. *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). Substantial evidence is evidence sufficient to persuade a rational fair-minded person that the premise is true. *Id*. We will "not disturb findings of fact supported by substantial evidence even if there is conflicting evidence." *Id*. We defer to the finder of fact on issues regarding witness credibility and the weight of conflicting evidence. *In re Wash. Builders Benefit Trust*, 173 Wn. App. 34, 65, 293 P.3d 1206, *review denied*, 177 Wn.2d 1018 (2013).

Conclusions of law are reviewed de novo. *Blackburn v. State*, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016). We also review a trial court's conclusions of law to determine whether they are

supported by its findings of fact. *Seven Sales, LLC v. Otterbein*, 189 Wn. App. 204, 208, 356 P.3d 248 (2015).

B.      SERVICE OF PROCESS

Velocity argues that the trial court erred when it found that Velocity was properly served. Velocity argues that strict compliance with the personal service statute for corporations is required. We disagree.

1.      Legal Principles

Proper service of process is essential to invoking personal jurisdiction over a party. *In re Estate of Kordon*, 157 Wn.2d 206, 210, 137 P.3d 16 (2006). Insufficient service of process is an affirmative defense. *Oltman v. Holland Am. Line USA, Inc.*, 163 Wn.2d 236, 244, 178 P.3d 981 (2008); CR 12(b). Whether service of process was proper is an issue that we review de novo. *Kim v. Lakeside Adult Family Home*, 185 Wn.2d 532, 554, 374 P.3d 121 (2016).

A party "waives any claim of lack of personal jurisdiction if, before the court rules, he asks the court to grant affirmative relief, or otherwise impliedly consents to the court's exercising jurisdiction." *State ex rel. Coughlin v. Jenkins*, 102 Wn. App. 60, 63, 7 P.3d 818 (2000). When a party asserts permissive "counterclaims, cross-claims, or impleads a third party, [it] is seeking affirmative relief and is thereby invoking the jurisdiction of the court. [It] cannot at the same time deny that jurisdiction." *Kuhlman Equip. Co. v. Tammermatic, Inc.*, 29 Wn. App. 419, 424, 628 P.2d 851 (1981) (quoting *Globig v. Greene & Gust Co.*, 193 F. Supp. 544, 549 (E.D. Wis. 1961)).

A permissive counterclaim is "any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." CR 13(b).

Permissive counterclaims do not affect and are not affected by the outcome of the original claim. *Atlas Supply, Inc. v. Realm, Inc.*, 170 Wn. App. 234, 238, 287 P.3d 606 (2012).

    2.      Waiver of Personal Jurisdiction and Insufficient Service of Process Claims

In this case, John, Kristie, and Velocity filed several permissive counterclaims in response to Cory Newingham's claim for breach of contract, including claims for libel, slander, defamation, intentional infliction of emotional distress, and tortious interference with business activities. In doing so, they argued that Cory intended to harm John and Kristie, individually, and their business enterprise, Velocity. These counterclaims did not arise out of the breach of contract claim that Cory initiated and the outcome of such claims would not affect Cory's claim.

Velocity noted in its answer that Cory failed "to serve process on defendants in the manner and form required by law," and Velocity argued during trial that the court lacked jurisdiction over Velocity due to improper service. CP at 57. However, Velocity sought affirmative relief by filing permissive counterclaims and invoked the jurisdiction of the court. It cannot assert permissive counterclaims and simultaneously argue that the court lacked jurisdiction over it due to improper service of process. *Kuhlman*, 29 Wn. App. at 424.

Furthermore, Velocity's argument that the defenses of insufficient service of process and lack of personal jurisdiction are distinct is belied by its own argument in this case that a lack of personal jurisdiction resulted from the insufficient service of process. The two defenses are intertwined as proper service of process is essential to invoking personal jurisdiction. *Kordon*, 157 Wn.2d at 210. Therefore, we hold that Velocity waived the defense of lack of personal jurisdiction and insufficient service of process.

B.    DEFAMATION

John and Kristie argue that the trial court erred when it concluded that they did not establish the tort of defamation because they failed to prove falsity.  Specifically, they argue that there was no "affair" because when John had sexual relations with Kaycee, only Kaycee was married and not John.  We disagree.

Defamation is concerned with compensating a party for damage to their reputation. *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 767, 320 P.3d 77 (2013), *review denied*, 180 Wn.2d 1026 (2014).  In order to establish a claim of defamation, the defamation plaintiff must prove four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages.  *Duc Tan v. Le*, 177 Wn.2d 649, 662, 300 P.3d 356 (2013), *cert. denied*, 134 S. Ct. 941 (2014).  To establish the falsity element of defamation, the defamation plaintiff must show that the offensive statement was "provably false."  *Valdez-Zontek v. Eastmont Sch. Dist.*, 154 Wn. App. 147, 157, 225 P.3d 339 (2010).  A statement may be provably false by: (a) falsely representing the state of mind of the person making it; (b) falsely attributing it to a person who did not make it; or (c) falsely describing the act, condition, or event of its subject matter.  *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 591, 943 P.2d 350 (1997), *review denied*, 134 Wn.2d 1013 (1998).

An affair is defined as "a romantic or passionate attachment typically of limited duration" and "an illicit sexual relationship."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (1969).  The trial court found that John and Kaycee had an affair.  The trial court further found that at the time of the affair, John was not married, but Kaycee was married to Scott.

These findings were based on the uncontroverted testimony provided at trial.  Both John and Kaycee testified to having sexual relations while Kaycee was married to Scott.  John testified

that his sexual relations with Kaycee occurred when he was living with Scott and Kaycee. Thus, substantial evidence supported the trial court's findings.

Based on these findings, the trial court concluded that John and Kristie failed to establish the falsity element for their defamation claim. Because the trial court found that John and Kaycee had an affair, Cory's online post about John and Kaycee's affair was a true statement and cannot be the basis of a defamation claim. The trial court's conclusion that John and Kristie failed to establish falsity is supported by the trial court's findings. We hold that the trial court did not err.

C.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

John and Kristie argue that the trial court erred when it concluded that they did not establish the tort of intentional infliction of emotional distress. In doing so, they assign error to a number of the trial court's findings and conclusions regarding the existence of an affair (Findings of Fact 38-39, 41-43); the lack of proof as to the effects of Cory's post (Finding of Fact 44); the communication between John and Cory (Finding of Fact 48); the effect of the confrontation on the family (Finding of Fact 51); the failure to prove falsity and damages for their defamation claim (Conclusion of Law 7); and the failure to prove intent to inflict emotional distress (Finding of Fact 52; Conclusion of Law 9). However, they do not provide argument supporting these assignments of error and rely on the argument raised in the previous section, which only discusses the falsity element of defamation. When an appellant fails to provide argument for a claimed assignment of error in their opening brief, the assignment of error is waived. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we decline to address this claim.

D.    OFFER MADE UNDER DURESS

John, Kristie, and Velocity argue that the trial court erred when it concluded that "a new . . . contract was never formed" at the family meeting.[2]  CP at 280.  We disagree.

Here, the trial court found that the parties anticipated and expected that the commission agreement reached between John, as president of Velocity, and Cory would be long-term and that John "confirmed and reaffirmed that he would continue to pay Cory commissions for an indefinite period of time as originally agreed."  CP 277 (Finding of Fact 28).  The trial court's findings are supported by substantial evidence.

At trial, evidence was presented about the commission agreement.  Cory testified that John offered to pay him, and he agreed to receive, "10 percent of every sale that goes through the shop" that were customers that Cory brought in for as long as Velocity did business with them.  1 VRP at 31.  Cory testified that there was no termination date and that his position as general manager of Velocity was separate from this commission agreement.  John also testified that he made an offer to Cory involving the payment of commissions, but that he believed the commission payments would stop if Cory's employment at Velocity ever terminated.

We defer to the trier of fact on issues of witness credibility and the weight of conflicting evidence.  *Wash. Builders Ben. Trust*, 173 Wn. App. at 65.  Therefore, based on the evidence

---

[2] John, Kristie, and Velocity also assign error to the trial court's findings and conclusions regarding the initial offer from John and Velocity and Cory's acceptance (Findings of Fact 7-8, 12-13); the expectations of the parties (Findings of Fact 10, 24); the existence of a binding oral contract (Conclusion of Law 1); and damages (Conclusions of Law 5-6).  However, they only provide argument that John made a new agreement at the family meeting to keep making commission payments to Cory under duress.  Therefore, we hold that the remaining assignments of error are waived.  RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

before the trial court, substantial evidence supports the trial court's finding that the commission agreement would be long-term.

Testimony was also provided regarding the family meeting. Cory denied ever threatening suicide and testified that because John wanted his termination from Velocity to be the least detrimental as possible to the family, he would continue to pay Cory's commissions as agreed upon. Ronnie testified that he received a call from Amanda saying Cory was threatening suicide and asked John to talk to Cory. Ronnie then stated that John believed he and Cory could work out a peaceful separation and that he would continue to pay Cory's commissions. Ronnie also said that no one forced John to pay the commissions. Ferguson confirmed that no one coerced John into continuing to make the commission payments to Cory, and that he did not hear Cory mention suicide. However, John testified that he felt the need to continue to pay Cory's commissions because he thought it was "the only way to make the situation better." 1 VRP at 140. John stated that he felt pressured because Cory was threatening suicide and people were upset.

Again, we defer to the trial court on matters of credibility and weight of conflicting testimony. *Id.* And we do not disturb findings supported by substantial evidence, even if there is conflicting evidence. *Merriman*, 168 Wn.2d at 631. Here, substantial evidence supports the trial court's finding that John "confirmed and reaffirmed that he would continue to pay Cory commissions for an indefinite period of time as originally agreed." CP 277 (Finding of Fact 28).

John, Kristie, and Velocity also challenge the trial court's conclusion that "a new and different commission contract was never formed after Cory was terminated from Velocity." CP at 280 (Conclusion of Law 4). The trial court did not err.

16

A party should not be allowed to avoid a contractual obligation by saying he was coerced into doing what he was obligated to do in the first place. Here, the trial court's finding that there was a long term commission agreement and that John merely reaffirmed continued payments for an indefinite period of time as originally agreed to supports the trial court's conclusion that there was no new and different agreement formed during the family meeting.

Thus, substantial evidence supports the trial court's finding that there was a long term agreement to pay Cory commissions as long as the customers Cory brought in did business with Velocity and that this agreement was reaffirmed by John at the family meetings. These findings support the trial court's conclusion that a new contract was not formed at the family meeting after Cory was terminated from Velocity. The claim that the agreement reached at the family meeting to continue paying Cory was made under duress fails.[3]

ATTORNEY FEES

Cory argues that he is entitled to attorney fees on appeal. First, Cory cites RAP 18.1, which allows a party to recover attorney fees on appeal where authorized by applicable law. *Dan's Trucking, Inc. v. Kerr Contractors, Inc.*, 183 Wn. App. 133, 143, 332 P.3d 1154 (2014). However, Cory then cites RCW 4.84.290 and RCW 4.84.250, which only apply to damage actions of $10,000 or less. The judgment awarded in this case was for damages and prejudgment interest of $55,914.97 in favor of Cory. Thus, RCW 4.84.290 and RCW 4.84.250 are inapplicable.

---

[3] John and Kristie assign error to a number of the trial court's other findings and conclusions, regarding the existence of an affair, the lack of proof as to the effects of Cory's post, and the failure to prove damages, but do not provide argument supporting these assignments of error. Accordingly, we decline to address them. RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

No, 48818-3-II

Second, Cory cites RCW 4.84.185, which allows for a party to receive expenses for opposing frivolous action or defense. In regard to an appeal, RAP 18.9(a) allows us to sanction a party who files a frivolous appeal. An appeal is frivolous when, considering the entire record and resolving all doubts in favor of the appellant, it does not present any debatable issues about which reasonable minds might differ and "'is so devoid of merit that there is no possibility of reversal.'" *Dewitt v. Mullen*, 193 Wn. App. 548, 560, 375 P.3d 694 (2016) (quoting *Advocates for Responsible Dev. v. W. Wash. Growth Mgmt. Hr'gs Bd.,* 170 Wn.2d 577, 580, 245 P.3d 764 (2010)). But here, whether Cory properly effected service of process for the trial court to invoke personal jurisdiction over Velocity presented a debatable issue. As a result, RCW 4.84.185 is also inapplicable, and we decline to award Cory his attorney fees on appeal.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, J.

Bjorgen, C.J.

18